OZIAS W. FLETCHER *et al.*

*v.*

THE PEOPLE OF THE STATE OF ILLINOIS.

*Filed at Ottawa May 15, 1886.*

1. CRIMINAL LAW—*in prosecution for murder—evidence bearing on degree of punishment.* As the jury trying one on a charge of murder may fix the punishment, in case of a conviction, from fourteen years in the penitentiary to that of death, evidence is admissible to enable the jury properly to fix the degree of the punishment. In such case the defendant has the right to give any evidence which tends to show his conduct was less culpable than shown to be by the prosecution.

2. NEW TRIAL—*newly discovered evidence—of a cumulative character, or to impeach witness.* The general rule that a new trial will not be granted merely for the purpose of admitting cumulative evidence or to impeach a witness, is subject to exceptions.

3. It can not be objected to granting a new trial on the ground of newly discovered evidence, that it is cumulative, merely, if it is of a different kind or character from that adduced on the trial.

4. After the trial and conviction of a party for murder, it was discovered by the defendant that one of the principal witnesses for the prosecution, in the expectation of death, had made a statement of the facts attending the homicide, very different, in several important respects, from his testimony on the stand, and which was much more favorable to the defendant, and had been reduced to writing and delivered to the State's attorney, and it was also made to appear that neither the defendant nor his counsel had been guilty of negligence in failing to ascertain the existence of such new evidence. It was *held,* error to refuse a new trial in order that such newly discovered evidence might be produced.

WRIT OF ERROR to the Circuit Court of DuPage county; the Hon. CHARLES KELLUM, Judge, presiding.

Mr. JOHN VAN ARMAN, and Mr. CHARLES W. DWIGHT, for the plaintiffs in error.

Mr. JOHN A. RUSSELL, State's attorney, and Mr. ALBERT H. GARY, for the People.

Per CURIAM: Ozias W. Fletcher, and Merritt Fletcher, his son, were indicted by the grand jury of Kane county for the murder of Otto J. Hope, in that county, on the 1st day of June, A. D. 1884. On the application of the defendants the venue was changed to DuPage county, and the defendants were tried in the circuit court of that county, at its March term, A. D. 1885. The jury returned a verdict finding Ozias W. Fletcher guilty of manslaughter, and fixing his punishment at confinement in the penitentiary for the term of three years, and finding Merritt Fletcher guilty of murder, and fixing his punishment at death by hanging. Motion for new trial was made by the defendants, and overruled by the court, and judgment was then rendered on the verdict.

The homicide occurred on Sunday morning, in a public highway, near the residence of the Fletchers. Hope had in his employ a laborer named Eli Steinbourne, who was born in France, who understood and spoke German, but who did not speak or understand English. Steinbourne, under Hope's direction, had been pasturing Hope's cattle in the highway. The Fletchers had also been pasturing their cattle in the same highway. On Saturday, the day before the homicide, Ozias W. Fletcher, Merritt Fletcher, and another son of Ozias, named Frank, had trouble with Steinbourne, resulting in some violence, growing out of the mutual pasturing of Fletcher's and Hope's cattle in the same highway. On Sunday morning Fletcher's cattle were being pastured on the highway, and Hope's cattle were brought there for that purpose, by Hope

and Steinbourne. Ozias W. Fletcher, Merritt Fletcher and Frank Fletcher were in the highway, sitting or standing, near the Fletcher cattle. Hope and Steinbourne left Hope's cattle behind them and advanced to the Fletchers. A personal conflict immediately ensued, during which Merritt Fletcher shot and killed Hope and shot Steinbourne twice, seriously wounding him. The only witnesses of the transaction were the parties engaged. There was evidence tending to prove antecedent malice on the part of the Fletchers, the preparation of arms, threats, etc., and there was also evidence tending to deny this. We deem it improper to prejudice another trial by commenting on the evidence.

The Fletchers claimed and gave evidence tending to prove that they were lawfully at the place, not anticipating violence; that they were attacked at first,—Ozias W. by Hope, and Merritt by Steinbourne,—and afterwards, that both Steinbourne and Hope were upon Merritt, having him down and beating him, when he fired the fatal shots in self-defence. Steinbourne testified, in substance, that he and Hope, seeing the Fletchers in the road, left their cattle behind and advanced to them, having at the time sticks in their hands, with which they had been driving their cattle; that Hope and Ozias W. Fletcher were soon using bad language, which he could not understand; that Ozias W. Fletcher raised a stick which he had in his hand, as if to strike Hope, when the witness ran up and interposed his stick, saying "halt! la," to prevent Hope being struck; that as he did so, Merritt fired his revolver, striking the witness in the right side; that Hope then sprang for Merritt, and Merritt shot him, and Steinbourne, trying to again interpose on behalf of Hope, was first assaulted by Ozias W. with a knife, though not cut, and he was afterwards again shot by Merritt. He emphatically denied that either he or Hope hit Ozias W. before Merritt shot. He again stated that about a half a second after Hope jumped behind witness to get hold of Merritt, Hope was shot.

It was proved by affidavits on the motion for a new trial, that Steinbourne, on the 2d day of June, A. D. 1884, believing that he was then going to die, made a statement under oath, which was interpreted and reduced to writing, which reads as follows:

"*Statement of Eli Steinbourne.*—I worked for Otto J. Hope. Drove cattle for him. Last Saturday I drove cattle on the cross-road. Fletcher's boy, Frank, came and drove my cows back. Boy went away. Short time after old man Fletcher and his two sons came back to where I was watching the cattle. They tried to drive my cattle back. I told them to let them alone, then they struck me with clubs, drove me and the cattle back towards home. Sunday morning Hope and I went with the cattle to see the reason why his cattle could not feed on the road. When we got the cattle down on the cross-road we saw the three Fletchers, each one having a club, driving their cattle up the road toward us. Hope said, 'We'll go and see what they want.' We went to them. The young boy was in the middle of the road, the old man was next to Ingham's hedge, the young man was on the fence west of the road. The one on the fence threw a knife to the boy in the road. I told Hope. Hope then went to talk with old Fletcher. Could not understand what was said. I was in the middle of the road. Old man Fletcher raised his arm with the club, to strike Mr. Hope, and then I run up and struck old man Fletcher with the stick I had, to keep him from licking my boss. The boy on the fence jumped off, and shot me once in the right hip. He was about six feet from me. Hope went for him, tried to take the revolver from him. Hope threw him on the ground. Then Fletcher shot him, I think twice. Old man Fletcher came with a knife. I held him back so that he could not strike Hope. Hope went off. Young Fletcher shot me again in the right side, and I went away. I heard old Fletcher say to his son who shot me, 'That's all right.' The old man tried to cut me with a knife, while I was holding him to keep

him from following up Hope. I make this statement under the full impression and belief that I can not get well—that I am going to die," etc.

Affidavit of Theodore Euen—"Interpreted the above correctly."

The affidavits showed that neither the defendants nor their attorneys had any knowledge of the existence of this statement until since the trial, when they accidentally learned of it; that they were guilty of no negligence in not having ascertained its existence; that the statement, when made, was placed in the hands of the State's attorney of Kane county, and kept by him until his term of office expired, when he handed it over to his successor in office, who retained its possession, and did not disclose its existence to the defendants or their attorneys. We think no negligence can, in any respect, be imputed to the defendants or their attorneys, with regard to this statement.

Conceding, for the sake of argument, that the evidence authorized the jury to find that the shooting was with premeditated malice, (but as to the correctness of this we express no opinion,) still our statute provides: "Whoever is guilty of murder shall suffer punishment of death, or imprisonment in the penitentiary for his natural life, or for a term not less than fourteen years. If the accused is found guilty by a jury, they shall fix the punishment by their verdict." (Sec. 190, Crim. Code, 1 Starr & Curtiss, page 795.) The common law recognized no such varying degree of guilt. All murder, by that law, was the same,—the punishment must be death. But a majority of the court are of opinion, that, in the contemplation of this statute, there may be every technical element of murder existing, and yet the circumstances be such that the jury would be justified in imposing punishment by confinement in the penitentiary for fourteen years only, and still other circumstances justifying them in imposing different degrees of punishment, up to that of death.

It necessarily follows, that in order to determine the degree of punishment to be imposed for this offence, evidence must be admissible which would not have been admissible, or, if admitted, could have availed nothing, at common law. And so a majority of the court conclude that if Steinbourne's attention had been called to this statement on the trial, and he had admitted that he had made it, and that it was true, it must have tended to have the effect to put the conduct of Merritt in a less unfavorable light before the jury than it was put by the evidence Steinbourne gave upon the trial. If Merritt, in the first instance, did not shoot until after his father had been struck with a stick by Steinbourne, his conduct, however inexcusable, is certainly, in a moral point of view, in some degree less objectionable than it would have been if he had shot before. And if he did not shoot and kill Hope until after Hope had thrown him on the ground, his act is also, in this respect, in some degree, however slight it may be, less culpable than it would have been if he had shot him before, when he might, without difficulty, have retreated from the conflict. If Steinbourne had denied making this statement, it would have been competent to have contradicted him, and so have discredited his testimony. But the existence of the statement not having been known to the defendants or to their counsel, it has been impossible to avail of it.

The general rule is, that a new trial will not be granted merely for the purpose of admitting cumulative evidence, or to impeach a witness. The rule, however, is subject to exceptions. (*Cochran* v. *Ammon et ux.* 16 Ill. 316.) In *Fabrilus* v. *Cook*, 3 Burrows, 1771, Lord MANSFIELD granted a new trial because of the discovery, subsequent to the trial, that the judgment was rendered upon the testimony of a witness whose testimony was suborned. In *Peagram* v. *King*, 2 Hawks. 605, (11 Am. Dec. 793,) a court of equity decreed a new trial at law because of the discovery, subsequent to the trial, that the judgment was rendered upon perjured evidence. In

*Wright* v. *The State*, 44 Texas, 642, where the principal witness for the State, in an affidavit stated that her evidence given on the trial was incorrect, and her mother, by affidavit, stated that she was unreliable, it was held to be grounds for a new trial as subsequently discovered evidence.    So in *G. F. M. C. Co.* v. *Mathers*, 5 N. H., it was held sufficient° ground for a new trial that one of the witnesses on whose evidence the verdict was rendered, was convicted of perjury in his testi-·mony, on his own confession.    In *Durant* v. *Ashmore*, 2 Rich. L. 184, a new trial was granted on after discovered written evidence, which might have affected the witness' credit with the jury.    And to the same effect is *Ecfort* v. *Descondres & Co.* 1 Mill. 70.    It can not be objected to granting a motion for a new trial on the ground of newly discovered evidence, that such evidence is cumulative, if it is of a different kind or character from that adduced on the trial.    Wharton on Criminal Pleading and Practice, (8th ed.) sec. 870; *Long* v. *The State*, 54 Ga. 564; *Guyott* v. *Butts*, 4 Wend. 579.

A majority of the court are of opinion that the facts here disclosed, under the peculiar circumstances of the case, exempt this statement from the operation of the general rule referred to, and that a new trial ought to have been granted to Merritt Fletcher.    A majority of the court see no cause to disturb the judgment against Ozias W. Fletcher, but they hold there was error in not granting a new trial to Merritt Fletcher.

The judgment against Ozias W. Fletcher is affirmed.    The judgment against Merritt Fletcher is reversed, and the cause is remanded for a new trial.

*Judgment reversed in part and in part affirmed.*

Mr. JUSTICE MAGRUDER, dissenting.