# Court of Appeals.

June 19, 1900.

## THE PEOPLE v. EDWARD WISE.

### (163 N. Y. 440.)

MURDER—EVIDENCE NECESSARY TO CONVICT.

> Two witnesses testified to having passed the man who was afterwards killed, that they heard a thud, saw one man lying on the sidewalk and another stooping over him. that the latter ran up the street. The man was closely followed by a bystander who kept him in sight until he was caught by an officer, to whom defendant said, " What is the matter, I didn't rob anybody." He said he was in a fight with four or five. When told the the man was dead, he said, " My God, if I had known that you never would have got me," etc. *Held,* that while the evidence as to the cause of injury was somewhat meagre, it was sufficient to carry the case to the jury and justified the verdict of murder.

APPEAL from a judgment of the Supreme Court, rendered at a Trial Term for the county of New York, March 31, 1899, upon a verdict convicting the defendant of the crime of murder in the first degree, and from an order denying a motion for a new trial.

The facts, so far as material, are stated in the opinion.

Abraham Levy, for appellant.

Charles E. Le Barbier, for respondent.

HAIGHT, J. The facts disclosed by the evidence are, in substance, as follows: On the evening of the second day of November, 1898, at about half-past eleven o'clock, Daniel C. Hess and wife were returning from the Casino Theatre to their residence, No. 331, located between Eighth and Ninth avenues on the north side of 29th street in the city of New York. After passing Eighth avenue they observed a man wearing a pearl fedora hat, with an overcoat, walking slowly

in front of them. They overtook and passed him just before reaching their residence and as they did so Mrs. Hess observed two men coming toward them on the same side of the street, one about ten feet in advance of the other. Arriving at their own home they ascended the steps to the stoop and Mr. Hess took the key from his pocket and inserted it in the door. At this instant they heard a sound as if some one had been struck a blow or had dropped to the pavement, a thud or a fall, and turning they saw three men, one lying upon the sidewalk, one standing about a foot from the fallen person and the other, two or three feet west of him. The man standing nearest the prostrate body stooped over and put his hands down both sides of the body. He was thus engaged from a half to three-quarters of a minute and during this time the man who was standing spoke to him, but their conversation was not heard; thereupon the man raised up and immediately started to run toward Eighth avenue. Mr. and Mrs. Hess were about thirty feet away, and as the man started to run Hess called out " stop thief, " and then he and his wife walked out to the prostrate figure and recognized him as the person they had passed upon the walk a minute before. About that time another person came out from one of the houses near by, and while Hess was speaking with him the other man that was observed standing near the body disappeared. Shortly thereafter, Mrs. McElroy, who lived next door to the Hesses, came out, and recognized the man lying upon the walk as Charles F. Beasley. As Hess called " stop thief " one Philip Riesz was walking upon the opposite side of the street, and had his attention attracted to the man by the call of Hess. He saw the man as he started to run and immediately started in pursuit. They ran to the corner of Eighth avenue, where the fugitive turned north and ran diagonally across the avenue toward Thirtieth street. As Riesz reached the corner of Eighth avenue he saw Officer Butterfield, and called to him to catch the man. The man had not, at that time, been out of his sight. Officer Butterfield says that he saw the man coming down Twenty-ninth street

as fast as he could run, and as he crossed Eight avenue toward Thirtieth street he ran across to intercept him, at the same time asking him what was the matter. The man turned his head and said, "Nothing, there was a fight up the street," and he continued on running. At the same time Riesz came running up shouting, "Police, stop that man." Thereupon Butterfield called upon the man to stop, but he did not, and increased his gait, running toward Thirtieth street, Butterfield following him. Officer Sims was standing at the corner of Thirtieth street and Eighth avenue, and he joined Butterfield in the chase, catching the man as he turned up Thirtieth street toward Seventh avenue. It proved to be the defendant, and he was not once out of the sight of Officer Butterfield after he turned into Eighth avenue from Twenty-ninth street. The defendant was first caught by Officer Sims, and as he grabbed him the defendant said: "What is the matter, I didn't rob anybody." The officer then asked him what he was running for, and he said he had "run in with a fellow up the street." The officers then took him back, conducted by Riesz, whom they met shortly afterwards, to the place where Beasley laid, upon Twenty-ninth street. An examination of the body showed that the coats were unbuttoned and open; that the trousers' pockets and one of the pockets of the vest were turned inside out. A smell of the breath disclosed a slight odor of alcohol. On raising the man from the walk, it was discovered that there was a large clot of blood upon the back of the head and upon the walk. An ambulance was then procured and Beasley was taken to the Roosevelt Hospital, where he died the next morning. A *post mortem* examination showed a fracture at the base of the skull, with extensive laceration of the brain and hemorrhage. There was a wound in the scalp at the most prominent point of the skull posteriorly connecting with the fracture, which began at that point and extended through the base of the skull. The medical experts gave it as their opinion that the injury described was the cause of death. When the officers returned with the defendant to where Beasley was lying,

the defendant was observed to stoop over and reach down to his shoe on the right-hand side. He was then taken to the station house, where he was searched by Officer Butterfield, and all that he found was a small pocket knife and a penny. The defendant then gave his name and place of residence to an officer in charge, stating that he lived at No. 203 West Thirtieth street, and had been living there for about a week; that he came from Fall River in company with a man named John Dalton, and that they had hired the room together; that on the evening in question he had been to a pool room on Forty-second street and Eighth avenue, and that he was returning through Twenty-ninth street when he found a fight in the street in which four or five were engaged; that one person struck him in the chest, driving him back four or five feet into the street, and that he then hit back, but did not know whom he had hit. The next morning the defendant asked Butterfield to send a dispatch for him, and took out of his pocket a roll of bills with which to pay the expense. Butterfield then remarked that he did not find that the night before when he made his search, to which the defendant answered, saying he did not look in the right place. When he was told that Beasley was dead he staggered as though he had been struck, and said, " My God, if I had known that you never would have got me. " He then sat down in a chair and commenced to cry. Finally he shook himself and said: " Oh, well, I don't care; I can prove the man was drunk. " A close watch was placed over the house in which the defendant and Dalton lived, but Dalton has never been found. This is, in substance, the evidence stripped of immaterial details.

The theory of the prosecution is that the defendant and his companion intended robbery, and that, finding Beasley alone, walking slowly and partially under the influence of liquor, they determined to rob him; that one of them struck him in the back of the head with a stone or some other weapon, producing the fracture which subsequently caused his death; that, as he fell, the defendant stooped over and hurriedly extracted

from his pockets whatever they contained of value, leaving the three pockets turned inside out, as has been described; that being warned by his companion that Hess and his wife were observing them, the defendant hastily arose and started to run. Upon the trial no evidence was offered by the defendant. The case was sent to the jury upon the People's evidence, and the verdict rendered sustains the claims of the prosecution. Is there any other reasonable theory that can be drawn from the facts disclosed? It is suggested that Beasley was intoxicated and that he might have fallen, by reason thereof, striking his head upon the curbstone, and in that way received the injury which caused his death. We are told however, by both Mr. and Mrs. Hess, who walked behind him for some distance, that whilst he was walking slowly they did not notice him stagger or exhibit any indications of intoxication. It is clear that he did not fall until he met the defendant and the other person. There was no outcry, struggle or other noise except the thud. As he fell his body lay across the walk, his feet toward the fence and his head toward the curb, but it did not reach to the curb within a foot or more as indicated by the pool of blood found upon the ground. He was insensible, and apparently did not move after he fell. In determining the cause of the injury all the facts and circumstances surrounding the transaction must be taken into consideration—the statements as well as the conduct of the defendant, which, in this case, speaks louder than words. The three men described met upon the street in the night. A thud was heard and one fell to the walk. The defendant says there was a fight and he admits that he struck some one, and yet no sound of a struggle or a scuffle was heard by the Hesses. After the fall the defendant immediately bent over the prostrate figure. The coats were unbuttoned, the pockets turned inside out, and then he jumped up and ran. To our minds the conduct of the defendant is inconsistent with that of innocence. It is very evident that robbery was the motive and that robbery was attempted. . Whether the defendant found money upon the person of the deceased the

evidence does not disclose further than that he had money in his possession the next morning. It may be that the evidence as to the cause of the injury is somewhat meagre, but we think it sufficient to carry the case to the jury and that it justifies the verdict rendered.

Some difficulty was experienced by the district attorney upon the trial in tracing the body of Beasley after he had been taken to the hospital and in identifying his body as that upon which the *post mortem* examination was made. In order to establish these facts quite a number of the employees of the hospital were called as witnesses. Some exceptions were taken to the evidence of these witnesses and to that of the *post mortem* examiners upon the ground that the body of Beasley was not sufficiently identified. We do not understand that these exception are now urged as grounds of error, but if they were, we think the evidence in the end satisfactorily established the identity of the body as that of Beasley. In fact his brother, who visited the morgue of the hospital at about noon the following day, was finally called and positively identified the body.

No exception was taken by the defendant to the charge of the court. Numerous requests to charge were made, every one of which were charged by the court, some with modifications to which the defendant's counsel assented.

The defendant was convicted of murder in the first degree under that provision in the Code which defines the crime as " without a design to effect death by a person engaged in the commission of, or in an attempt to commit a felony either upon or affecting the person killed or otherwise." As we have seen, the claim of the prosecution in this case is that the defendant and his associate contemplated robbery; that that was their motive, and in order to accomplish their design Beasley was struck a blow which caused him to fall and produced insensibility. If the blow was struck for this purpose, and death resulted, then it constituted the crime contemplated by the statute. Under the charge of the court the attention of the

jury was called to this provision of the Code and the jurors were, in substance, instructed that they could convict of murder in the first degree under no other provision; that if they were not satisfied of the defendant's guilt under this provision, they should consider whether a crime of a lesser degree had been committed, and if not, to acquit. The appellant's counsel has called our attention to the case of People v. Willett, 36 Hun, 500, from which he insists that the evidence does not establish the crime of which the defendant has been convicted. But in that case the defendant testified in his own behalf that he did not intend larceny at the time that he struck the blow with a brass faucet; that he struck the blow in the heat of passion, and after having done so, he formed the conclusion to take the money of the deceased, not knowing at that time that he had killed him. The question was thus raised for the determination of the jury as to the motive and intent of the defendant in striking the blow which caused the death. The facts in that case differ widely from those in this case. In that case the defendant claimed to have been insulted by the man whom he struck; in this case the defendant and his associate met Beasley upon the street, a stranger; no words were spoken or quarrel ensued. If, as the jury has found, he was struck down by a blow from the defendant for the purpose of robbery there can be no question but that the facts come within the requirements of the statute.

The judgment of conviction should be affirmed.

PARKER, Ch. J., GRAY, O'BRIEN, LANDON and WERNER, JJ., concur; MARTIN, J., dissents.

Judgment of conviction affirmed.